IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| ALFA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:20cv553-MHT |
| | ) | (WO) |
| ALPHA WARRANTY SERVICES, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

In this trademark case, the court finds itself in
"the rather swampy area of unfair competition." *John H.
Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 969
(11th Cir. 1983) (citations omitted). Plaintiff Alfa
Corporation sues defendant Alpha Warranty Services, Inc.,
asserting several federal claims under the Lanham Act,
including trademark infringement pursuant to 15 U.S.C.
§ 1114(1), unfair competition pursuant to 15 U.S.C.
§ 1125(a), and cancellation of a federal trademark
registration pursuant to 15 U.S.C. § 1119, as well as
Alabama state-law claims for trademark dilution and

common-law trademark infringement. The court has subject-matter jurisdiction pursuant to 15 U.S.C. § 1121(a) (Lanham Act), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338 (trademarks and unfair competition), 28 U.S.C. § 1332(a) (diversity of citizenship), and 28 U.S.C. § 1367(a) (supplemental jurisdiction). This case is now before the court on defendant's motion for summary judgment. After oral argument, the court concludes that the motion should be denied.

## I. SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the admissible evidence in the light most favorable to the nonmoving

party and draw all reasonable inferences in favor of that party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.*

## II. FACTUAL BACKGROUND

The facts, taken in the light most favorable to the non-movant, are as follows.

Plaintiff Alfa Corporation is an Alabama-based company that sells a range of insurance products and financial services. Plaintiff grew out of the Alabama Farmers Federation in 1946 and has done business under the name "Alfa Insurance" since 1987. Plaintiff chose the name "Alfa" due to its length, simplicity, and ease of remembering, to convey strength and reliability, and to reflect the company's heritage as an outgrowth of the Alabama Farmers Federation. Plaintiff views the name as useful in part due to its similarity to the Greek word

3

"Alpha," which implies first and best. Customers, businesses, and the public generally refer to the company using the single word "Alfa."

Plaintiff has a number of federally registered trademarks, including "ALFA," "Alfa Insurance," "Alfa Financial," "Alfa Cares," and others. It has a trademark on the following design and other similar designs:



Plaintiff has had a federal trademark on the service mark "Alfa Insurance" since 1987 and on the service mark "ALFA" since 2012. It has acted to protect its marks by sending cease-and-desist letters to potential infringers at least 18 times between 2005 and 2021, including to companies using the spelling "Alpha" in their marks.

4

Plaintiff sells a range of insurance products, including automobile, home, life, business, health, dental, and other types of insurance. It sells automobile insurance policies under the name "Alfa Insurance" in only Alabama, Mississippi, and Georgia (hereafter referred to as plaintiff's "home area").[1] Its products are sold through its network of dedicated agents, who have offices using prominent "Alfa" logos and branding, as well as through its website and its customer service agents. Its agents offer its customers a product called major mechanical insurance, issued by another insurance company, in conjunction with auto loans extended by Farm Bureau Bank. Major mechanical insurance is an insurance policy that covers the cost of repairing certain mechanical breakdowns in vehicles.

Plaintiff and its related companies have spent millions of dollars over the years advertising and promoting its products and services using the "Alfa"

---

1. Plaintiff sells insurance products in several other states under a different name.

trademarks and has generated billions of dollars in sales under these marks.

Defendant Alpha Warranty Services is a Utah-based company that sells vehicle service contracts (VSCs). VSCs are contracts to pay for the cost of repairs stemming from covered mechanical breakdowns in automobiles, should such breakdowns occur.[2]  Consumers purchase defendant's VSCs through the finance and insurance (F & I) representatives employed at car dealerships at the time of an automobile purchase.  Defendant's VSCs are primarily marketed to consumers orally by a car dealership's F&I representative.

Defendant has a single federal trademark, for the service mark "Alpha Warranty Services."  It filed its application to register a federal trademark for "Alpha Warranty Services" in March 2016.  It was at this time that plaintiff became aware of defendant's existence.

_____

2.  The major-mechanical insurance product plaintiff's agents offer and defendant's VSCs are competitive products in that a consumer may purchase one or the other but is unlikely to purchase both.

6

Defendant's trademark application initially represented that it would provide "insurance services," among other products, under the mark.  In 2016, after discovering defendant's trademark application, plaintiff sent a cease-and-desist letter to defendant warning that defendant was infringing on plaintiff's trademarks. Defendant did not respond to the letter.  However, it amended its application to remove "insurance services" from the description of the services it would provide under the mark.  The United States Patent and Trademark Office approved defendant's amended trademark application.

In 2018, plaintiff sent another cease-and-desist letter to defendant, after becoming concerned that defendant was selling VSCs in plaintiff's home area. Again, defendant did not respond to the letter.  In early 2020, plaintiff hired a private investigator to find out whether defendant was selling VSCs in Alabama.  The investigator found a used car dealer that was selling defendant's VSCs in mid-January of 2020.  Around six

months after receiving this information, plaintiff filed this lawsuit.

### III. DISCUSSION

Plaintiff brings three federal claims under the Lanham Act, as well as common-law infringement and statutory dilution claims under Alabama law. In its motion for summary judgment, defendant attacks each of the federal claims as well as the common-law infringement claim on the ground that no reasonable jury could find that its use of its mark creates a likelihood of confusion with plaintiff's marks. It also attacks the federal claims under the equitable doctrine of laches and submits that both state-law claims are barred by the applicable statutes of limitations. The court will address the likelihood of confusion first, then turn to the laches and statute-of-limitations arguments.

## A. Plaintiff's Claims

Before analyzing the likelihood of confusion, the court pauses to summarize the showing required for each of plaintiff's claims. As discussed below, a showing of likelihood of confusion is necessary for most, but not all, of plaintiff's claims.

As previously noted, plaintiff brings three Lanham Act claims: one for trademark infringement under 15 U.S.C. § 1114(1), one for unfair competition under 15 U.S.C. § 1125(a), and one for cancellation of defendant's federal trademark under 15 U.S.C. § 1119. To prove trademark infringement under 15 U.S.C. § 1114(1), a plaintiff must show "(1) that its mark has priority and (2) that the defendant's mark is likely to cause consumer confusion."[3] *PlayNation Play Systems, Inc. v. Velex Corp.*, 924 F.3d 1159, 1165 (11th Cir. 2019) (citing *Frehling Enter., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999)). To prove unfair competition under 15 U.S.C. § 1125(a), a plaintiff must

_____

3. There is no dispute that plaintiff's marks have priority over defendant's mark.

9

show "(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 358 (11th Cir. 1997) (citations omitted), *opinion modified on reh'g*, 122 F.3d 1379 (11th Cir. 1997).  The test for likelihood of confusion is the same for both types of infringement. *See Tana v. Dantanna's*, 611 F.3d 767, 773 n.5 (11th Cir. 2010) (citing *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1503–04 (11th Cir. 1985)).

A claim for cancellation of a federal trademark under 15 U.S.C. § 1119 may also turn on the likelihood of consumer confusion, though cancellation can also be sought on grounds unrelated to confusion.  To prove a cancellation claim, a plaintiff must show "(1) that it had standing to petition for cancellation because it was likely to be damaged by the infringer's continued use of the infringing mark, and (2) that there were valid

10

grounds for discontinuing registration." *PlayNation Play Sys.*, 924 F.3d at 1171 (citing *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1557 (11th Cir. 1991)).[4]   A plaintiff satisfies the first element--standing--by showing that it has a federally registered trademark.  *Id.* (citing *Coach House*, 934 F.2d at 1557-58).  If, at the time a request for cancellation is filed, the challenged mark "has been on the federal Principal Register in registrant's name for less than five years, the mark may be cancelled if ... [the plaintiff] can prove that the registration should have been barred in the first instance under Lanham Act § 2."  *Id.* (quoting *Coach House*, 934 F.2d at 1558).[5]

_____

4.  15 U.S.C. § 1119 states: "In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."

5.  When a trademark has been on the Federal Register for five years or more, the grounds for cancellation are more limited.

Here plaintiff argues that registration should have been barred in the first instance because "the registered mark is likely to cause confusion when used in connection with the services of registrant." *Id.* (citing *Coach House*, 934 F.2d at 1559). Accordingly, the likelihood-of-confusion test applies to this cancellation claim as well. In the complaint, plaintiff also seeks cancellation on a fraud theory, alleging that defendant misrepresented to the United States Patent and Trademark Office that it was not involved with insurance-related services. The fraud-based cancellation claim does not require showing a likelihood of confusion.

Turning to plaintiff's state-law claims, an Alabama common-law infringement claim requires proof that "the complainant's trade is in danger of harm from the use of its name by the respondent in such a manner as it is likely to deceive the public into the belief that the respondent's affairs, in the respect complained of, are those of the complainant." *Fuqua v. Roberts,* 110 So. 2d

12

886, 887 (Ala. 1959) (citations omitted).  "In other
words, a central element of a claim of trademark
infringement under Alabama common law, just as under the
Lanham Act, is the likelihood consumers will be misled
by the similarity of the parties' marks." *Alfa Corp. v.
Alfa Mortg. Inc.*, 560 F. Supp. 2d 1166, 1175 (M.D. Ala.
2008) (Watkins, J.); *see also Arthur Young, Inc. v.
Arthur Young & Co.*, 579 F. Supp. 384, 389 (N.D. Ala.
1983) (Lynne, J.) (citations omitted) ("The test of
infringement of marks registered with the Alabama
Secretary of State and of common law marks and trade
names is the same as under the Lanham Act, namely, whether
the alleged infringer's mark creates a likelihood of
confusion.").

In contrast, plaintiff's statutory dilution claim
does not turn on the likelihood of confusion, but instead
on whether its mark is "famous and distinctive."  Ala.
Code § 8-12-17(a) (1975).  While "an infringement action
is based on the likelihood of consumer confusion between
suppliers of competing goods in the same geographic

locale[,] ... a dilution action is based on the concept that a strong trademark has value beyond its ability to distinguish a good or service's source." *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1024 (11th Cir. 1989); *see also id.* ("[D]ilution analysis is fundamentally different from infringement analysis; the former focuses on the dilution of a mark's distinctive quality while the latter focuses on the likelihood of consumer confusion."). Therefore, plaintiff's dilution claim will not be impacted by the likelihood-of-confusion analysis.

## B. Likelihood of Confusion

Assessing likelihood of confusion "involves two steps. At step one, the court considers several factors which can provide circumstantial evidence of likelihood of confusion. ... Or, to put it another way, the court conducts several separate inquiries on the factors which yield 'circumstantial facts' that shed light on the likelihood of confusion as a whole." *FCOA LLC v. Foremost*

*Title & Escrow Servs. LLC*, 57 F.4th 939, 947 (11th Cir. 2023) (citing *Fla. Int'l Univ. Bd. of Trs. V. Fla. Nat'l Univ., Inc.* ("*FIU*"), 830 F.3d 1242, 1255 (11th Cir. 2016)).   "*[E]ach* of these factors is analytically a separate factual inquiry relevant to, but ultimately independent of, likelihood of confusion."   *Id*. n.12 (emphasis in original).

The factors courts consider in determining likelihood of confusion include: "(1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public." *Tana*, 611 F.3d at 774–75 (citation omitted).   In addition, courts have "analyzed consumer sophistication as a separate

factor or circumstantial fact relevant to determining likelihood of confusion." *FCOA*, 57 F.4th at 947 (citing *FIU*, 830 F.3d at 1256).

"At step two, the court weighs each of the relevant circumstantial facts—independently and then together—to determine whether the ultimate fact, likelihood of confusion, can reasonably be inferred." *FCOA*, 57 F.4th at 947 (citing *Frehling*, 192 F.3d at 1335). "Of these, the type of mark and the evidence of actual confusion are the most important." *Frehling*, 192 F.3d at 1335.

### 1. Step One

The court now turns to step one: reviewing the evidence of each factor in the light most favorable to the plaintiff.

### a. Strength of the Mark

The first factor is the strength--or consumer recognition--of plaintiff's "Alfa" marks. *See FCOA*, 57

F.4th at 948.[6]  A mark's strength determines how much protection it is entitled to receive: stronger marks receive more protection than weak ones.  *See id.* (citing *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1361 (11th Cir. 2007)).  There are two parts to "assessing the strength of a mark: conceptual strength and commercial strength."  *Id*.

Conceptual strength is determined "by placing a mark on a sliding scale of trademark strength, from weakest to strongest: (1) generic, (2) descriptive, (3) suggestive, and (4) fanciful or arbitrary."  *FCOA*, 57 F.4th at 949 (citing *Frehling*, 192 F.3d at 1335; *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

"Generic marks are the weakest and not entitled to protection--they refer to a class of which an

---

6. The strength of a trademark is closely related to its distinctiveness. "To be valid, a trademark must be 'distinctive'—that is, it must 'serve the purpose of identifying the source of ... goods or services,' not just the goods and services themselves. ... '[A] mark can be 'inherently' distinctive, or it can 'acquire' distinctiveness over time." *Engineered Tax Servs., Inc. v. Scarpello Consulting, Inc.*, 958 F.3d 1323, 1327 (11th Cir. 2020) (citations omitted). "Distinctiveness is a function of ... a mark's 'strength.'"  *Id.*

individual service is a member (*e.g.,* 'liquor store' used in connection with the sale of liquor). ... Descriptive marks describe a characteristic or quality of an article or service (*e.g.,* 'vision center' denoting a place where glasses are sold). ... Suggestive terms suggest characteristics of the goods and services and require an effort of the imagination by the consumer in order to be understood as descriptive. ... For instance, 'penguin' would be suggestive of refrigerators. ... An arbitrary mark is a word or phrase that bears no relationship to the product (*e.g.,* 'Sun Bank' is arbitrary when applied to banking services). ... Arbitrary marks are the strongest of the four categories."

*Frehling*, 192 F.3d at 1335−36 (internal citations and quotation marks omitted).

Suggestive and arbitrary marks are viewed as "inherently distinctive," and therefore are considered strong. *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.* ("*SCAD*"), 983 F.3d 1273, 1282 (11th Cir. 2020) (quoting *Tana*, 611 F.3d at 774). "Generic and descriptive marks are so weak that they are not valid trademarks." *FCOA*, 57 F.4th at 949 (citing 15 U.S.C. §§ 1115(b)(4), 1065(4)). An exception to this rule applies when "a descriptive mark ... acquires 'secondary meaning,' ... [that is,] when consumers view the mark as

18

synonymous with the mark holder's goods or services." *Id.* (quoting *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 950 F.3d 776, 782–83 (11th Cir. 2020)).  In such a case, a descriptive mark may be strong enough for trademark protection under the Lanham Act.

A descriptive mark is also considered relatively strong when it has "incontestable" status.  *Frehling, Inc.*, 192 F.3d at 1336.  If a mark "has been registered for five years with the [United States] Patent & Trademark Office, its holder has filed the affidavit required by 15 U.S.C. § 1065(3) with the Patent & Trademark Office, and the Patent & Trademark Office has accordingly declared the mark 'incontestable,' then the mark's incontestability serves to enhance its strength." *Id.* (citing *Wilhelm Pudenz, GmbH v. Littlefuse, Inc.*, 177 F.3d 1204, 1208 (11th Cir. 1999); *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 328–29 (11th Cir. 1989)).[7]  In other words, even if a mark is merely

---

7. "In *Dieter* ..., [the Eleventh Circuit Court of Appeals] held that a mark's incontestable status is a factor to be taken into consideration in the likelihood-of-confusion analysis, concluding that the

descriptive, it is presumed "relatively strong" if it has incontestable status. *FCOA*, 57 F.4th at 949 (quoting *Dieter*, 880 F.2d at 329).

As discussed earlier, plaintiff has several trademarks, all of which contain the word "Alfa," either alone or with other words, such as "Alfa Insurance," "Alfa Financial," and "Alfa Cares." The written word "Alfa" is a fanciful or arbitrary mark, which is the strongest type of mark. It is a 'made up' word that has no logical relationship to insurance or financial services. *See Frehling*, 192 F.3d at 1335 (explaining that "the categories [of marks] are based on the relationship between the name and the service or good it

_____

incontestable status required a presumption that the mark was 'at least descriptive with secondary meaning, and therefore a relatively strong mark.'" *SCAD*, 983 F.3d at 1280 n.10 (quoting *Dieter*, 880 F.2d 322, 329 (11th Cir. 1989)). Panels of the appeals court subsequently "have recognized that *Dieter* is an outlier and opined that it is 'almost certainly incorrect.'" *Id.* (quoting *Sovereign Mil. Hospitaller Ord. of Saint John v. Fla. Priory of the Knights Hospitallers of the Sovereign Ord. of Saint John*, 809 F.3d 1171, 1183 (11th Cir. 2015)). In any case, *Dieter* remains good law at present, so this court is bound by it.

describes") (citing *John H. Harland Co.*, 711 F.2d at 974)).

When spoken, the word "Alfa" sounds identical to the word "Alpha." The words are homophones. The word "alpha" is a noun meaning the first letter of the Greek alphabet or something that is first or dominant, and is also an adjective meaning having the highest rank or being the most dominant. *See, e.g., Alpha*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/alpha (last visited September 19, 2023); *Alpha*, Dictionary.com, https://www.dictionary.com/browse/alpha (last visited September 19, 2023). To the extent one focuses on sound alone, the one-word mark "Alfa" therefore might be viewed as descriptive. However, there is no dispute that all of plaintiff's "Alfa" marks have incontestable status; accordingly, even when considered only in their spoken form, a reasonable jury could find them to be relatively strong marks. *See Frehling,* 192 F.3d at 1336.

Defendant contends that plaintiff's "Alfa Insurance" and "Alfa Financial" marks are "merely descriptive,"

Renewed Motion for Summary Judgment and Supporting Memorandum Brief (Doc. 67) at 35[8], and that these conclusions follow from application of "the 'imagination' test and the 'third-party-use' test ... [which] work in tandem to distinguish suggestive from descriptive marks." *Engineered Tax Servs., Inc. v. Scarpello Consulting, Inc.*, 958 F.3d 1323, 1329 (11th Cir. 2020). The imagination test asks whether a "customer who observes the [plaintiff's mark] can readily perceive the nature of plaintiff's services, *without having to exercise his imagination*.'" *Id.* (emphasis in original) (citation omitted). The third-party-use test "ask[s] whether competitors would be likely to need the terms used in the trademark in describing their products." *Id.* at 1331 (citations omitted).

Relying on the imagination test, defendant argues that the marks "Alfa Insurance" and "Alfa Financial" are descriptive because a customer would readily know that

_____

8. Page numbers of parties' filings refer to the electronic filing system's page number, not the page number provided by the filing party.

the mark refers to a company that provides insurance or financial services. This argument fails because defendant places too much emphasis on the terms "Insurance" and "Financial" in its analysis and too little emphasis on the term "Alfa." As a rule, "[i]t is appropriate in determining the question of likelihood of confusion to give greater weight to the important or 'dominant' parts of a composite mark, for it is that which may make the greatest impression on the ordinary buyer." 4 McCarthy on Trademarks and Unfair Competition § 23:42 (5th ed. 2023); *see also id.* ("[A]ll courts agree that it is proper to give more weight to the 'dominant' part of a mark in the likelihood of confusion analysis."); *id.* § 23:44. Here, the dominant part of plaintiff's multiword marks is "Alfa," and a customer focusing on the term "Alfa" would need to use her imagination to determine what services plaintiff provides.

Indeed, courts routinely downplay the significance of generic and descriptive terms like "Insurance" in

marks, finding marks containing such terms to be suggestive or arbitrary nonetheless. For example, the Eleventh Circuit Court of Appeals has repeatedly stated that "Sun Bank" is an arbitrary mark when applied to banking services, despite the presence of the word "Bank" in the name. *See, e.g., FCOA*, 57 F.4th at 949 (quoting *Frehling*, 192 F.3d at 1335). And, in the very case that defendant cites for the imagination test, the court held that a reasonable jury could decide that a tax-services company's mark, "Engineered Tax Services," is suggestive and inherently distinctive, despite the inclusion of the words "Tax Services" in the mark. *See Engineered Tax Servs.*, 958 F.3d at 1330-31. Therefore, a reasonable finder of fact could find that plaintiff's "Alfa Insurance" and "Alfa Financial" marks are suggestive or perhaps even arbitrary.

Under the third-party-use test, "[i]f a competitor 'need[s]' the [opposing party's] mark to describe its own product, ... [the mark] must not be distinctive of the mark holder's product." *Id.* at 1331 (citation omitted).

**24**

Applying that test here, defendant and other competitors do not need the marks "Alfa Insurance" or "Alfa Financial" to describe their own products. Under this test, too, a reasonable factfinder could find plaintiff's marks suggestive and inherently distinctive rather than merely descriptive.

In any case, as noted earlier, all of plaintiff's marks have incontestable status. Therefore, even if they were merely descriptive, they would be presumed relatively strong unless the presumption were "rebutted by a strong showing of third-party use of the mark that significantly impacts consumer recognition of the original mark." *FCOA*, 57 F.4th at 950 (citing *FIU*, 830 F.3d at 1257; *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1545 n.27 (11th Cir. 1985)). As discussed below, the evidence in the record of third-party use is not sufficient to overcome this presumption. In sum, a reasonable factfinder could find that plaintiff's marks are conceptually strong.

25

Of course, the analysis of conceptual strength does not conclude the inquiry, as courts must also consider the commercial strength of a mark. "Commercial strength refers to the real-world consumer recognition of a mark, most often created by the efforts and work of the mark holder." *FCOA*, 57 F.4th at 950 (citing *FIU*, 830 F.3d at 1258; *John H. Harland Co.*, 711 F.2d at 974 n.13). Factors relevant to commercial strength include advertising and promotion, quantity of sales, number of customers, third-party use of a mark, recognition of the mark by various groups, and surveys of likely customers. *See FCOA*, 57 F.4th at 950 (citing *FIU*, 830 F.3d at 1259; 2 McCarthy §§ 11:81, 11:83 (4th ed. 2016)). As noted above, "a strong showing of third-party use of the mark that significantly impacts consumer recognition of the original mark" can reduce the strength of a mark. *FCOA*, 57 F.4th at 950 (citations omitted); *see also Frehling*, 192 F.3d at 1336.

Substantial evidence in the record supports plaintiff's argument that its marks are commercially

strong.  As mentioned above, advertising and sales are relevant to commercial strength, and the record reveals that plaintiff has spent many millions of dollars on advertising and promoting its marks and has earned billions in sales under those marks.  In addition, plaintiff has been selling its products under the "Alfa Insurance" mark for over 30 years.  The record contains very little evidence of any third-party use of plaintiff's marks.  Indeed, the only mention in the record of third parties using the term "Alfa" appears in a few cited cases in which plaintiff policed its trademarks.

Defendant argues, however, that the strength of plaintiff's marks is weakened by widespread third-party use of the term "Alpha," which sounds identical to "Alfa."[9]  Defendant has not provided probative evidence of third-party use here.  As evidence of third-party use, defendant submits only the printed results of a search

_____

9.  The court assumes, without deciding, that use of a phonetically identical mark that is spelled differently is relevant to the analysis of third-party use.

of a trademark database for the terms "Alpha" and "insurance." But evidence of mere registrations does not reduce the strength of a mark: "because the consuming public is unlikely to be aware of mere federal registrations of third-party marks, such evidence is not probative of the diminished distinctiveness of the original mark." *FCOA*, 57 F.4th at 950–51 (quoting *Turner v. HMH Publ'g Co.*, 380 F.2d 224, 228 & n.2 (5th Cir. 1967)[10]); 2 McCarthy § 11:89 (5th ed. 2023) ("The mere citation of third party *registrations* is not proof of third party *uses* for the purpose of showing a crowded field and relative weakness. Third party registrations are not evidence of use 'so as to have conditioned the mind of prospective purchasers.'" (emphasis in original)).

---

10. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

In sum, a reasonable jury could find that plaintiff's "Alfa" marks are both conceptually and commercially strong.

### b. Similarity of the Marks

The second part of the test is the similarity of the marks. "[T]he greater the similarity ..., the greater the likelihood of confusion." *Sovereign Mil. Hospitaller Ord. of Saint John v. Fla. Priory of the Knights Hospitallers of the Sovereign Ord. of Saint John* ("*Sovereign Mil.*"), 809 F.3d 1171, 1186 (11th Cir. 2015) (quoting *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980)). "Two marks need not be identical to support a finding of infringement, and the key question remains whether the marks are sufficiently similar 'to deceive the public.'" *FUI*, 830 F.3d at 1260 (quoting *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 33 (1900)). In analyzing the similarity of the marks, the court must consider "the overall impression created by the marks, ... [including]

the appearance, sound and meaning of the marks, as well as the manner in which the marks are used." *Id.* (citations and internal quotation marks omitted). "[A]lthough the marks ultimately must be considered as a whole, the focus of the inquiry regarding appearance and sound is on the non-generic portion*." John H. Harland Co.*, 711 F.2d at 976 (citation omitted); *see also* 4 McCarthy § 23:49 (5th ed. 2023) (observing that "it is proper to accord ... a generic term less weight in judging the similarity of ... marks").

Here, plaintiff has multiple registered marks, some consisting of only words and others consisting of designs and words, while defendant has only one mark consisting of words only: "Alpha Warranty Services."[11]   The court will therefore compare plaintiff's word-only marks to defendant's sole mark.  And, while there are differences in the generic terms used in some of plaintiff's marks

_____

11. Defendant's "Alpha Warranty Services" mark "consists of standard characters without claim to any particular font style, size or color."  Alpha Warranty Trademark Registration (Doc. 68-12) at 2.

and in defendant's mark, the main focus will be on the non-generic portion of the marks.

Although the marks clearly differ in certain ways, a reasonable factfinder could find that plaintiff's and defendant's marks are similar for several reasons. First, the marks share some similarity in appearance. The non-generic portion of the marks contains a fairly short word starting with the letters "Al" and ending in "a." Comparing "Alfa Insurance" to defendant's "Alpha Warranty Services" mark, both follow the non-generic term with a generic or descriptive term describing the product.

Second, as to the meaning of the marks, "Alpha" means the first letter of the Greek alphabet and has connotations of dominance and strength. The word "Alfa" is a coined term and has no dictionary definition. However, because it is phonetically identical to the word "alpha," it may be viewed as carrying the same connotations.

31

Lastly, and most importantly, while the generic portions of the marks sound different, the non-generic portions of the marks sound identical. Indeed, as stated, "Alfa" and "Alpha" are homophones, which sound the same but have different meanings, origins, and spellings. At least under plaintiff's theory, it is the sound of the marks that is the primary source of the likelihood of confusion.

Because the sound of the non-generic portion of the marks is identical, and the appearance and connotations are similar, a reasonable factfinder could find that the marks are similar.

### c. Similarity of the Products

The third factor, similarity of the products, "requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Frehling*, 192 F.3d at 1338 (citation omitted).

"The test is ... whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods[, ... and] [t]he focus is on the reasonable belief of the average consumer as to what the likely source of the goods [is]." *FIU*, 830 F.3d at 1261 (quoting *Frehling*, 192 F.3d at 1338) (internal quotation marks omitted).

Here, there is sufficient evidence in the record for a reasonable factfinder to conclude that plaintiff's insurance products and defendant's VSCs are the kinds of products that the public attributes to a single source. Multiple major insurance companies sell VSCs or similar products, including GEICO, Allstate, State Farm, USAA, and Progressive. Plaintiff's expert opined that most consumers are unaware of the distinctions between VSCs and the products sold by insurance companies that cover the costs of mechanical breakdowns. Moreover, evidence reflects that VSCs function like insurance, and some of defendant's marketing materials analogize VSCs to insurance. Based on this evidence, one could reasonably

conclude that consumers would attribute both products to a single source.

### d. Similarity of Trade Channels and Customers

The fourth factor--similarity of trade channels and customers--focuses on "where, how, and to whom the parties' products are sold." *Frehling*, 192 F.3d at 1339 (citation omitted). "Dissimilarities between the manner of sale and the typical customers of the parties' services lessen the possibility of confusion. ... [T]he parties' outlets and customer bases need not be identical, but some degree of overlap should be present for this factor to support a finding of likelihood of confusion." *FIU*, 830 F.3d at 1261 (citing *Frehling*, 192 F.3d at 1339).

Defendant's customers consist of people purchasing primarily used cars across the country, including in plaintiff's three-state home area. Plaintiff's customers include people purchasing new and used cars, as well as a wide range of people seeking various types of insurance

and financial services, primarily in its three-state home area, but also in other states. While their customer bases are far from identical, there is significant overlap.

There is little to no overlap in the parties' sales outlets. Plaintiff sells its insurance products directly to consumers through its dedicated agents in offices throughout its home area and through its website and customer service representatives. Defendant sells its VSCs to consumers through auto dealerships, except for a small percentage of their products that are sold through finance companies or banks. Defendant has a website that can be shown to the consumer by the dealership's representative during the transaction, to provide more information to the consumer, but it does not sell directly to consumers through a website.[12]

_____

12. Plaintiff argues that its offering of a major mechanical protection policy to insurance customers highlights the similarity of the parties' sales outlets. But the fact that plaintiff sells a mechanical protection product through its dedicated agents does not render the parties' retail outlets similar, as customers cannot purchase plaintiff's insurance through a car dealership.

As the evidence points both ways, a reasonable jury could decide either for or against plaintiff on this factor.


    e. Similarity of Advertising

    "The fifth factor used in evaluating the likelihood of confusion is the similarity between the parties' advertising campaigns. The greater the similarity in the campaigns, the greater the likelihood of confusion." *John H. Harland Co.*, 711 F.2d at 976 *(*quoting *Exxon Corp.,* 628 F.2d at 506). The advertising methods need not be identical; instead, "the standard is whether there is likely to be significant enough overlap in the [audience of the advertisements] that a possibility of confusion could result." *FIU*, 830 F.3d at 1262 (quoting *Frehling*, 192 F.3d at 1340) (internal quotation marks omitted). "The key question in assessing similarity of advertising media is whether the parties' ads are likely to reach the same audience." *Id.* at 1263.

Defendant targets most of its direct marketing efforts to automobile dealerships and to independent agents who in turn promote defendant's products to automobile dealerships, and it relies upon on the automobile dealerships to market its products directly to consumers. Dealership representatives primarily market defendant's VSCs to customers orally, but evidence reflects that defendant also provides dealerships with posters and pamphlets advertising its VSCs, and that these materials may be placed where dealership customers can see and read them. Defendant has also produced videos that dealerships can use with customers to sell VSCs, and has created a website with information about its VSCs that dealership employees can show to customers.

In contrast with defendant, plaintiff targets advertising directly to automobile purchasers, including through mass advertising on television, radio, billboards, newspapers, and magazines, and through its independent insurance agents whose offices prominently bear its design mark in various localities.

Plaintiff's advertising targets a broad swath of consumers in its home area. Defendant's advertising primarily targets independent agents and auto dealerships, and to some extent targets customers of the dealerships. While there is some overlap in the people the advertising will reach, the overlap is quite limited. In sum, there is not sufficient evidence in the record to find similarity of advertising.

### f. Defendant's Intent

This factor requires the court to determine whether defendant had an "intent to confuse customers." *SCAD*, 983 F.3d at 1284; *see also* 4 McCarthy § 23:113 (5th ed. 2023) ("An 'intent' sufficient to support, along with other evidence, a finding of a likelihood of confusion must be an intent to confuse, not just an intent to copy."). Intent to confuse can be proven with evidence that the defendant "had a conscious intent to capitalize on the plaintiff's business reputation, was intentionally blind, or otherwise manifested improper intent" in

choosing its trademark. *FIU*, 830 F.3d at 1263 (quoting *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 648 (11th Cir. 2007) (internal quotation marks omitted)).

Here, the undisputed evidence shows that defendant originally selected the name "Alpha" as an homage to the company founder's former military unit and that it was unaware of plaintiff's existence until 2016. Plaintiff concedes that there is insufficient evidence for a finding of conscious intent to capitalize on its business reputation but instead argues that defendant was intentionally blind in selecting its name.

In support of its intentional-blindness argument, plaintiff points to several aspects of the testimony of defendant's in-house counsel, who testified as defendant's corporate representative under Federal Rule of Civil Procedure 30(b)(6). First, plaintiff relies on counsel's failure to provide any evidence that defendant researched whether there was a similarly named company either before first choosing the name "Alpha Warranty

Services" or at any time before it began preparing its federal trademark application.  Second, plaintiff notes that, when defendant's in-house counsel searched for companies with a similar name while preparing defendant's federal trademark application, he did not find any such companies, did not search for companies with the word "Alfa" in them, and did not document any of the research he did.  Finally, plaintiff points to evidence that, after receiving plaintiff's cease-and-desist letters in 2016 and 2018, defendant's in-house counsel documented neither the research he claims he did nor his conclusion that plaintiff's infringement claim was not valid, and that counsel did not call or write to plaintiff's counsel in response to the letters.  Though plaintiff does not expressly say so, the court assumes plaintiff points to the lack of documentation at least in part as evidence that in-house counsel did not actually conduct the research he claimed to have done.

Based on the lack of documentation, a factfinder might reasonably decide not to credit defendant's

corporate representative's testimony about the trademark searches he says he did or the legal conclusions he says he reached about the merits of plaintiff's infringement claim. *See* *Hansard v. Pepsi-Cola Metropo. Bottling Co.*, 865 F.2d 1461, 1465 (5th Cir. 1989) (relying on ambiguity of defendant's records and its unexplained lack of documentation for purported decision in finding a factual dispute for the jury as to discriminatory-discharge claim) (citing *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 262 (3d Cir. 1987) ("Evaluation of witness credibility is the exclusive function of the jury, and where the only evidence of intent is oral testimony, a jury could always choose to discredit it."))); *see also* *Lloyd v. Georgia Gulf Corp.*, 961 F.2d 1190, 1195 (5th Cir. 1992) (treating lack of documentation of reasons for employee's termination as evidence of employer's pretext). Were the factfinder to disbelieve the testimony, defendant's lack of diligence could be viewed as evidence of intentional blindness.

That said, "failure to perform an official trademark search, ... does not[,] standing alone[,] prove that [a defendant] ... acted in bad faith." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 460 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 746 (2d Cir. 1998)). Nor does a defendant's decision to continue using its mark after receiving a cease-and-desist letter necessarily establish an intent to confuse. Where a junior user of a mark "has a good faith belief" that its use of the mark creates no conflict with the senior user's mark, the junior user's continued use of the mark may not reflect an intent to confuse consumers. 4 McCarthy § 23:115 (5th ed. 2023).

In any case, the combined evidence here is sufficient for a reasonable jury to find intentional blindness. If--based on the lack of documentation of his work--the jury were to disbelieve the corporate representative's testimony about the due diligence defendant claimed to have done before submitting the trademark application,

and the jury were to find that defendant simply ignored plaintiff's repeated cease-and-desist letters without conducting an assessment of possible infringement, it could reasonably find intentional blindness and therefore intent to confuse consumers.


### g. Actual Confusion

Plaintiff concedes that there is no evidence of actual confusion.


### 2. Step Two

In step two of the likelihood-of-confusion analysis, "the court weighs each of the relevant circumstantial facts—independently and then together--to determine whether the ultimate fact, likelihood of confusion, can reasonably be inferred." *FCOA*, 57 F.4th at 947 (citing *Frehling*, 192 F.3d at 1335). "Of these [circumstantial facts], the type of mark and the evidence of actual confusion are the most important." *Frehling*, 192 F.3d at 1335.

As discussed above, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find that plaintiffs' marks are strong, that the parties' marks, products, and customers are similar, and that defendant had an intent to confuse in the form of intentional blindness.  On the other hand, a reasonable jury could not find that the parties' trade channels are similar or that there is any proof of actual confusion between the parties' marks.

Having considered each of the factors individually, the court concludes that none of the factors, on its own, provides a sufficient basis upon which a reasonable jury could find a likelihood of confusion.  But taking several factors together, a reasonable jury could find a likelihood of confusion, for the following reasons.

First, the record makes clear that consumer confusion, if it occurs, will result from the *sound* of the marks.  Defendant's VSCs are sold during oral conversations between car dealership representatives and consumers at the dealerships and are primarily marketed

orally.   Evidence  also  reflects  that  plaintiff  is
frequently referred to as simply "Alfa."  As defendant's
training video encourages dealerships to refer to their
products as simply "Alpha" VSCs, a jury could reasonably
conclude that defendant is likely to be referred to by
the one-word name "Alpha."  And, of course, "Alfa" and
"Alpha" sound identical, raising an inherent possibility,
if not a likelihood, of confusion.

While the identical sound of the non-generic portion
of the parties' marks may not be sufficient in and of
itself to support a finding of likelihood of confusion,
the identical sound combined with other evidence would
support a finding of likelihood of confusion.  First,
there is evidence that plaintiff's marks are commercially
strong in its home area.  Moreover, the record reflects
that automobile insurance, which plaintiff provides, is
routinely discussed during automobile purchases.  Given
the evidence of plaintiff's commercial strength, one
could reasonably conclude that a consumer hearing the

name "Alpha" in the context of an automobile purchase would think of plaintiff's "Alfa" insurance.

Evidence regarding the parties' marketing techniques only strengthens the likelihood of confusion. Plaintiff markets broadly to consumers, while defendant directs its marketing at independent agents and automobile dealerships. As a result, defendant's company almost certainly lacks broad consumer recognition. Given these facts, a jury could reasonably find that a consumer in plaintiff's home area who is offered an "Alpha" VSC is likely to believe that the product is sold by plaintiff "Alfa". The evidence that the parties' products are the type that consumers are likely to believe come from the same source only increases the likelihood of confusion stemming from the marketing issue.

As evidence that consumer confusion is not likely, defendant points to expert opinion evidence to the effect that dealership representatives do not frequently mention the name of the company in verbally selling VSCs. However, the jury could decline to credit this evidence.

Defendant also argues that any confusion created by mentioning the company's name orally would be eliminated when the customer signs the contract, which has the words "Alpha Warranty Services" and a small "a" symbol unlike plaintiff's trademarked designs at the top of the page. However, plaintiff has submitted expert evidence that consumers ordinarily do not read contracts before signing them. Moreover, based on the court's review of the contract, the defendant's name and symbol are not placed so prominently on the contract that they could not be overlooked.

In sum, based on a combination of factors, plaintiff has put forward sufficient evidence for a reasonable jury to find a likelihood of confusion, and the issue will need to be decided at trial. The motion for summary judgment, to the extent it is based on there being no likelihood of confusion, must be denied.[13]

_____

13. Also, at oral argument, the parties agreed that, if the court denied summary judgment on the likelihood-of-confusion issue, the cancellation claim should go forward. Accordingly, the court will not further address the cancellation claim.

## C. Laches

Defendant also moves for summary judgment on plaintiff's Lanham Act claims based on the equitable defense of laches, contending that plaintiff waited too long to assert its rights and thereby prejudiced defendant. At oral argument, the parties agreed that if the likelihood-of-confusion issue goes to trial, then the laches issues must go to the jury. Accordingly, the court will deny summary judgment on this issue. Nevertheless, the court will briefly explain its understanding of the law on this issue.

The Lanham Act lacks a statute of limitations. However, in cases under the Lanham Act, courts apply the equitable doctrine of laches to prevent undue prejudice due to a plaintiff's late assertion of its rights. "Though the doctrine is an equitable doctrine that should be applied flexibly, a defendant must demonstrate the presence of three elements in order to successfully assert laches as a defense: (1) a delay in asserting a

48

right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997) (citing *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545 (11th Cir. 1986)).

The "touchstone for laches" is found by looking at the limitations period for analogous state-law claims. *Id.* (citing *Ambrit,* 812 F.2d at 1546). Plaintiff here brings Lanham Act claims for trademark infringement, unfair competition, and trademark cancellation. Defendant proposes two potential state-law analogues. The first one is an action for trademark infringement under Code of Alabama §§ 8-12-16 and 8-12-18, which appears to be subject to a two-year residual statute of limitations. *See* Ala. Code § 6-2-38(l) (1975) (establishing two-year limitations period for "[a]ll actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section"); *see also* § 6-2-38(j) (establishing

two-year limitations period for "[a]ll actions ... for a penalty given by statute to the party aggrieved, unless the statute imposing it prescribes a different limitation").   The second is an action for deceptive trade practices under Code of Alabama § 8-19-10, which is subject to a one-year statute of limitations.   *See* Ala. Code. § 8-19-14 (1975).

"In terms of substantive rights and remedies, the Alabama Trademark Act is the most analogous to the Lanham Act.   *See* Alabama Code § 8–12–1 *et seq*.   Like the Lanham Act, the Alabama Trademark Act provides for the registration of trademarks, including trade names, and provides both damages and injunctive remedies for violation of the owner's rights in such marks."   *Solar Reflections, LLC v. Solar Reflections Glass Tinting, LLC*, 256 F. Supp. 3d 1248, 1255 (N.D. Ala. 2017) (Putnam, M.J.) (citing Ala. Code §§ 8-12-16 and 8-12-18).   The Alabama Trademark Act also provides a cause of action for trademark cancellation.   *See* Ala. Code § 8-12-13 (1975).   Meanwhile, the Alabama Deceptive Practices Act provides

a remedy for "unlawful trade practices" such as, "[p]assing off goods or services as those of another..., [c]ausing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services [,] ... [and c]ausing confusion or misunderstanding as to the affiliation, connection, or association with ... another." Ala. Code § 8-19-5 (1975). These practices, too, could constitute unfair competition under the Lanham Act. In any case, the court need not decide which state statute is most analogous at this time. The court will assume, for purposes of this discussion only, that the one-year statute of limitations applies.

Defendant argues that the delay should be measured from when plaintiff first had notice that it was using the mark "Alpha Warranty Services": in March 2016, when defendant filed its trademark application with the United States Patent and Trademark Office. But defendant's argument is based on a misunderstanding of the law.

"[D]elay is to be measured from the time at which the plaintiff knows or should know she has *a provable claim for infringement*. ... [A]ny other rule 'would require each trademark owner to sue first and ask questions later.'" *Kason Indus.*, 120 F.3d at 1206 (emphasis added) (citations omitted).  Accordingly, in considering a defense of laches, courts must consider issues of "progressive encroachment, damage the plaintiff was suffering, and the likelihood of confusion at the time the plaintiff sued." *Id.* (citations omitted); *see also* 6 McCarthy § 31:19 (5th ed. 2023) ("The senior user has no obligation to sue until 'the likelihood of confusion looms large[.]'"); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996) (agreeing with McCarthy that the owner of a mark "has no obligation to sue until 'the likelihood of confusion looms large'")).

The evidence, taken in the light most favorable to plaintiff, shows that while plaintiff learned of defendant's trademark application in 2016, it was not

until January 2020, about six months before this lawsuit was filed in July 2020, that plaintiff confirmed that defendant actually was doing business in one of its three home states. At least arguably, it was only then that the likelihood of confusion loomed large, and plaintiff's delay after that point did not pass the one-year threshold for a delay sufficient to raise the possibility of laches.

Defendant argues that it was obvious from its website that it was doing business in Alabama back in 2016. The court disagrees. As support for this argument, defendant relies on a printout from its website attached to an October 14, 2016, letter written by an attorney for plaintiff. Defendant contends that the website made clear that it was doing substantial business selling VSCs in all 50 states, including in plaintiff's three-state home area. As plaintiff's attorney was aware of this website, defendant's argument goes, plaintiff must have been aware that defendant was selling VSCs in plaintiff's home area.

A reasonable factfinder could view the website evidence differently.  The printout shows a part of defendant's website that makes three claims in large print:  the number of "authorized repair facilities," the availability of "24/7 Roadside Assistance," and, as relevant here, "50 States for Service," with no further explanation.  Website Printout (Doc. 1-2) at 9.  But defendant's interpretation of the phrase "50 States for Service" is not the only possible one, or perhaps even the most logical one.  Reading "50 States for Service" in the light most favorable to plaintiff, the phrase conveyed that purchasers of defendant's VSCs could have their vehicles *serviced* in all 50 states--not that consumers could *buy* defendant's VSCs in all 50 states.  Accordingly, the website does not establish that plaintiff knew in 2016 that defendant was doing business in its home area.  And without such evidence, likelihood of confusion would not necessarily have loomed large for plaintiff at that time.

To obtain summary judgment on the issue of laches, defendant would have needed to show that no reasonable factfinder could find for plaintiff on the issue of whether it delayed too long.  This defendant failed to do.  Accordingly, even if the parties had not agreed that this issue should go to the jury, the court would have denied defendant's motion for summary judgment on the issue of laches.

### D. Statute of Limitations

Plaintiff brings a claim for common-law trademark infringement and a trademark dilution claim under Alabama law.[14]  Defendant argues that these claims are barred by the applicable statutes of limitations.[15]

---

14.  The complaint does not specify which state's law applies to the common-law infringement claim. *See* Complaint (Doc. 1) at 23-24, para. 94-99.  As for the state-law dilution claim, the complaint states that plaintiff "is entitled to the relief provided for in the laws of each of the states where it does business, including as to Alabama."  Complaint (Doc. 1) at 25, para. 106.  Plaintiff clarified at oral argument that both claims are brought under only Alabama law.

15.  Defendant devotes only a one-line footnote in its summary-judgment brief to its "argument" that the

Alabama law does not provide a specific statute of limitations for common-law trademark-infringement claims. Section § 6-2-38, a statute setting forth the residual limitation periods for various types of claims, provides a two-year statute of limitations for "[a]ll actions for any injury to the ... rights of another not arising from contract and not specifically enumerated" under the statute. Ala. Code § 6-2-38(l) (1975). Common-law trademark infringement appears to fall in this category. *Cf. AVCO Corp. v. Precision Air Parts, Inc.*, 676 F.2d 494, 496 (11th Cir. 1982) (applying a similarly worded statute-of-limitations provision, from a statute that was repealed and replaced by § 6-2-38(l), to Alabama

_____

statute of limitations bars plaintiff's common-law infringement and statutory dilution claims. After mentioning in the body of the brief that a two-year statute of limitations applies to trademark infringement claims under Alabama law, it drops a footnote stating that this limitations period bars plaintiff's state-law claims. *See* Renewed Motion for Summary Judgment and Supporting Memorandum Brief (Doc. 67) at 47. While this was not sufficient to show entitlement to summary judgment, plaintiff agreed at oral argument to the court's consideration of the limitations issue on summary judgment.

copyright-infringement and trade-secret misappropriation claims); *Auburn Univ. v. Int'l Bus. Machines, Corp.*, 716 F. Supp. 2d 1114, 1118 (M.D. Ala. 2010) (Fuller, J.) (applying § 6-2-38(l) to unjust-enrichment claim based on theft of intellectual property); *Davis v. Dorsey*, 495 F. Supp. 2d 1162, 1171 (M.D. Ala. 2007) (Thompson, J.) (applying § 6-2-38(l) to claim for breach of fiduciary duty).

Plaintiff's trademark-dilution claim is brought under § 8-12-17 of the Code of Alabama, which is part of the Alabama Trademark Act. As mentioned earlier, the Act does not provide a specific statute of limitations. However, the following provision of the residual statute-of-limitations statute applies to such statutory claims: "All actions ... for a penalty given by statute to the party aggrieved, unless the statute imposing it prescribes a different limitation, must be brought within two years."  § 6-2-38(j).

Plaintiff argues that the statute of limitations does not bar a request for injunctive relief where there is

an ongoing violation. *See Solar Reflections*, 256 F. Supp. 3d at 1257 ("Because the complaint alleges an ongoing infringement, equity dictates that the right to injunctive relief, at least, should not be foreclosed by either statute of limitations."). It further argues that the court should deny summary judgment because it was not aware of defendant's infringement in Alabama until early 2020.

As discussed earlier, plaintiff first learned of defendant's existence and of its trademark application in 2016, and defendant appears to suggest that the statute of limitations began running on that date. But it is black-letter law that the statute of limitations does not begin to run until the claim accrues. *See, e.g., Ex parte Abbott Laboratories*, 342 So. 3d 186, 194 (Ala. 2021) ("The statute of limitations begins to run when the cause of action accrues, which this Court has held is the date the first legal injury occurs. ... A cause of action accrues as soon as the claimant is entitled to maintain an action, regardless of whether the

full amount of the damage is apparent at the time of the first legal injury." (citations and internal quotation marks omitted)).  Neither party has adequately addressed the accrual issue in the briefing.

In any case, the statute of limitations is an affirmative defense for which defendant bears the burden of proof, and it has failed to "show affirmatively the absence of a genuine issue of material fact" as to that issue.  *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991).  Accordingly, summary judgment on the state-law claims will be denied.

*****

Accordingly, for the reasons stated above, it is ORDERED that defendant Alpha Warranty Services, Inc.'s renewed motion for summary judgment (Doc. 67) is denied.

DONE, this the 26th day of September, 2023.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE